BOLIN,. Judge.
Cargill, Inc., a Delaware Corporation and Friedman Pipe and Steel Company, a partnership organized under the laws of the State of Texas, jointly sued Great American Indemnity Company, liability insurer of Foster Lee, Jr., and predecessor to the named defendant, for the sum of $8,935. This amount represented the alleged damage caused to a steel storage tank by the negligence of Foster Lee, Jr., in removing pipe from the tanks and causing an explosion on July 17, 1957.
The record shows that prior to the accident, Friedman Pipe and Steel Company granted a surface lease to Cargill, Inc., on the land upon which the tank farm was located. The agreement further granted Cargill the right and option to purchase the real estate but reserved to Friedman one hundred twenty days (120) from the exercise of the option within which to remove any pipe and fittings appertaining to the tank farm. Additionally, it was agreed that Cargill was to buy fourteen of the storage tanks located on the property, being those numbered nine through twenty-two inclusive. $50,000 of the purchase price of $125,000 was paid and the balance was to be due “upon approval of title to the said' tanks by Cargill’s attorneys and execution and delivery of deed thereto acceptable to said .attorneys.” Thirty days were granted for such an examination of the title.
Cargill was interested in the tanks for use in storing grain. As these tanks had formerly contained petroleum products, it was necessary that the sediment .and water be removed and they be thoroughly cleaned. This sediment had a resale value and Car-gill sold it to Hill Brothers, which was to remove the sediment so that the tanks could be cleaned by a concern known as the “M System”.
Cargill, prior to July 17, 1957, proceeded with the process of preparing the tanks for grain storage. Under a contract with the Friedman Group, Foster Lee, Jr., was *370 engaged in cutting and removing the pipe system by means of an acetylene torch.
A few days prior to the accident with which we are concerned, a small explosion or “backfire” occurred in connection with the removal of pipe from another tank. Fortunately no damage was done, and the workers inside the tank at the time were uninjured. Thereupon, for the safety of all concerned, Mr. Chrisner, a supervisor for Cargill, told Lee not to “cut inside the valve” unless he had received specific instructions to do so which would be given only after the tank had been cleaned and the workers had been cleared from the area. The accident resulted when Lee began cutting pipe leading into tank number nine before the tank had been cleaned, an4 without instructions that it was safe to so proceed. There is no controversy that the explosion was caused by the torch being used by Lee and that the damage to the tank resulted from the explosion and fire that followed.
Following the explosion and resulting damage, the transaction between Friedman Pipe and Steel Company and Cargill, Inc. was completed and the Friedman Group was paid the full price agreed on with no diminution because of the damage. The tank was repaired at the expense of Car-gill, Inc., and the amount expended in that effort, plus a sum for the loss of its use, is the sum sued for herein.
Defendant filed an exception of no right and no cause of action which was overruled by the court below and, at the trial on the merits, the judgment was in favor of plaintiff, Cargill, Inc., for the sum of $8,-935, it being admitted by the Friedman Group that any judgment so rendered should be in favor of Cargill, Inc.
The defendant appealed from the judgment, and both plaintiffs also perfected de-volutive appeals as precautionary measures. Defendant first contends that its insured was not negligent in the conduct of his operations which led to the accident. Secondly, assuming negligence, defendant again urges the exceptions of no cause and no right of action.
In order to correctly dispose of the first issue, it is necessary to examine more closely the physical setting of the area in which the accident occurred. The steel storage tank was surrounded by an earthen fire wall which was designed to restrain the oil in event the tank broke or a leak occurred. The main oil trunk line was outside this fire wall and was connected to all the tanks in the farm and was used to fill the tanks and to remove the oil therefrom as needed. There were two ten inch lines which ran from the trunk line to the tank itself. These two lines were approximately five feet apart and were more or less parallel, with a cut-off valve which was outside the fire wall and at about the point where they connected with the trunk line. One line was an intake line and the other an output line and both lines entered the tank near the base. The tank had a concrete floor which came up about eighteen inches on the tank wall and sloped downward to the center where there was a depression called a “sump pit”. The output line went down into the sump pit and the intake line went up and was movable. This was to allow the end of this line to be above the level of oil in the tank when oil was being pumped into the tank from the trunk line. It was this line that was being cut when the explosion occurred.
At the time of the accident, the rivets securing the door plate had been cut but had not been punched through and, for all practical purposes, the tank was still intact.
Lee testified that he thought the tank was empty of fluid and was reassured, so he testified, when he cut the first pipe and no oil ran out. He further testified that he knew the tank had not been steamed (the final step in cleaning) and that he had not been given any instructions to proceed by Mr. Chrisner.
It is apparent that the pipe first cut was the output line which ended in the sump pit and in which no gases could accumulate. *371 The second line cut was the intake line and since it ended above the level of the sediment, gases did accumulate therein and it was these gases which exploded when ignited by the cutting torch.
The defendant denies that its insured was negligent because the method used in removing the pipe was an accepted practice among those engaged in that endeavor and, also, that the violation of the instructions of Chrisner was not a factor as Lee owed no duty to Chrisner.
The first defense to the plea of negligence is based on the principle that ordinary care is exercised when one complies with the custom and usage of others engaged in the same activity. However, the practice which caused the damage here had resulted in explosions of one degree or another many times before and Lee, himself, testified that he had heard of, and encountered several, while he was in this occupation. Additionally he had experienced a similar, though less severe, explosion only a few days before on this same job.
It was said in Harris Drilling Company v. Delafield, 1952, 222 La. 416, 62 So.2d 627, 629:
“Custom and usage may be regarded as a matter proper for consideration in determining whether or not sufficient care has been exercised in a particular case, but it is not conclusive or controlling, for the customary way of doing a thing may be a negligent way and may create a false standard of care, and, once negligence is established, such negligence cannot be justified by custom.”
When the act is obviously dangerous, as was the case here, proof that others are similarly careless is of no avail.
The question raised by defendant as to his duty toward Cargill is also without merit. It is not necessary to consider whether Lee owed a special duty to Chris-ner or his employer, and whether the violation of the instructions was a breach thereof in view of LSA-C.C. 2315 which imposes a general duty upon every one not to do damage to another or to another’s property.
 That Lee, in view of the dangerous properties with which he was dealing, failed to exercise that degree of care which should be required of an ordinary prudent person under the existing circumstances, seems to us to be apparent. It is an established principle that when a person, by his fault causes damage to another, either by his act, his negligence, his imprudence, or his want of skill, he is obliged to repair it. Lange v. Illinois Central R. R. Company, 1902, 107 La. 687, 31 So. 1003; Moses v. Butts, La.App. 1 Cir., 1954, 70 So.2d 203.
Therefore, the only remaining defense to the claim is that no damage was incurred by either party plaintiff. This argument is based upon the contention that, at the time of the explosion, title was still vested in Friedman Pipe and Steel Company; that they received the full purchase price under the contract, and did not transfer the right of action to Cargill, and, therefore, Friedman suffered no damage and since there was no subrogation in favor of Cargill, that neither plaintiff can recover.
In other words, defendant contends that the property was damaged while still at the risk of the vendor and since the full price was paid, the vendor suffered no damage and, therefore, has no right and no cause of action. Further, that since the vendee knew of the damage and did not become subrogated to the rights of its vendor, Cargill has no right and no cause of action against the defendant.
Plaintiffs answer this argument on two grounds. First, that the stipulation for title examination was in favor of Cargill and was waived when the vendee took possession of the tanks and began to clean them, therefore, having title when the damage occurred. Second, that if title *372 was still vested in the vendor, that Cargill, Inc., even without formal subrogation, can recover against the defendant under the principles enunciated in Standard Motor Car Co. v. State Farm Mutual Automobile Insurance Company, La.App. 1 Cir., 1957, 97 So.2d 435.
While the argument advanced by the defendant herein to escape liability for the tortious acts of its insured is ingenious, we do not think it has merit. Because we feel that the second contention of the plaintiff listed above answers this case, we will not discuss the question of title set forth in the first contention. We do not believe it is material whether the cause of action is vested in Cargill or the Friedman Group, inasmuch as both parties are before the court. However, we do not agree that Cargill is without a cause of action. The evidence shows that Cargill had in fact taken delivery and possession of the tanks, prior to the explosion, and in fact, was storing grain in some of them. The transaction between Cargill and the Friedman Group was not a sale of only one tank, or tank No. 9, but was a sale in globo of fourteen tanks. The object or “thing” of the sale was fourteen tanks, and delivery had been made. Although the contract did contemplate the execution and delivery of a bill of sale, yet this was a provision purely for the benefit of Cargill. Therefore, it seems clear to us that Cargill was rightfully in possession of the tank, and that it is not necessary that we legally classify such possession as that of owner, agent, bailee or otherwise. By whatever means he was possessing, he was certainly not a stranger to the transaction and had a sufficient right to its possession to have it repaired as a result of the explosion, and to pay for such repairs.
We are of the opinion that the holding in the case of Standard Motor Car Company v. State Farm Mutual Automobile Insurance Company, supra, is controlling in the instant case. It is true that the facts in the cited case were different from those now before us, but the principles of law set forth therein, together with the citations of authority are pertinent to the question with which we are now confronted. There, a customer had left his automobile with a garageman in order to have same repaired. While the customer’s automobile was being driven by an employee of the garageman, it was involved in a collision with a third party. The garage-man brought a suit against the tort-feasor’s insurer for damages to the customer’s automobile. The defendant contended that the garageman was without a cause of action because he had not obtained a formal subrogation from the owner of the automobile. Judge Tate, as organ of the court, gave a thorough analysis of the law in question and held that the garageman could maintain his action without the necessity of a conventional subrogation. As pointed out in the cited case, there is a well established doctrine that a subrogation will not generally be decreed in favor of a mere volunteer or intermeddler who, without any duty, moral or otherwise, pays the debt or discharges the obligation of another. 50 Am.Jur. 696, “Subrogation”, Section 21. See also 83 C.J.S. Subrogation § 9, p. 601. See LSA-Civil Code Article 2161, especially 2161, subd. 3.
However, it certainly cannot be said, in this case, that Cargill was either a “volunteer” or “intermeddler”. In fact, he certainly had a moral as well as a legal duty to pay for the repairs to the tank involved herein, because at the time of the explosion he was exercising all of the elements of ownership and, within a short time thereafter, the formal transfer of title was perfected.
The Standard Motor Car Company case cites and discusses a prior case of Douglas v. Haro, 1949, 214 La. 1099, 39 So.2d 744. This case also involved damage to a vehicle by a third party while it was under the control of the garageman. The Orleans Court of Appeal (32 So.2d 387) sustained an exception of no cause of action against the garageman on the grounds that he was without interest to institute the suit under *373 Louisiana Code of Practice, Article IS. 'The Supreme Court granted writs and reversed the ruling of the Appellate Court and remanded the case to the district court in order that the owner of the automobile could be impleaded as a party-plaintiff to prevent the possibility of the garageman becoming unjustly enriched.
In differentiating Douglas v. Haro from the Standard Motor Company case, Judge 'Tate had this to say [97 So.2d 437]:
“However, we feel that under the pleadings in this particular case, this .requirement would be a useless technicality, since herein (unlike in Douglas v. Haro) the garageman-plaintiff lias specifically pleaded that he himself 'has paid the claim for the damages .■sustained by the car while deposited -with him.”
With reference to the holding and verbiage in the above cases, we say that the instant case is much stronger for the plaintiff. Here, the plaintiff has not only caused the repairs to be made to the tank and paid for same, but both parties were parties-•plaintiff in the pleadings.
It has also been held that, as against -third persons causing damage to property, the possessors (such as an administrator, depositary or consignee) of property dam.aged or stolen while in their possession, al•though not owned by them, have been per-, mitted to recover the property or for the •damages thereto, irrespective of their non- ownership thereof. Lannes v. Courege, 31 La.Ann. 74; Fowler v. Cooper, Caruthers & Co., 3 La. 215; Morgan v. Bell, 4 Mart., O.S., 615; McGrew v. Browder, 2 Mart., N.S., 17, 20; Klein v. Anderson, 4 Orleans App. 262.
As the quantum of the judgment below 'has not been seriously questioned, it is our .opinion that the said judgment is correct, .and it is affirmed at the cost of the defendant, Great American Insurance Company, .appellant and appellee herein.
Affirmed.